Filed 9/18/20  P. v. Jones CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEPFON JONES,<br><br>Defendant and Appellant. | F075895<br><br>(Super. Ct. No. BF159975A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Stepfon Jones (appellant) was charged, in count 1, with premeditated murder (Pen. Code, § 187, subd. (a))[1]; in count 2, with assault on a child under eight resulting in death (§ 273ab, subd. (a)); and in count 3, with felony child endangerment (§ 273a, subd. (a)).

On September 14, 2015, the trial court granted defense counsel's motion to suspend criminal proceedings for a competency evaluation. On April 6, 2016, the trial court found appellant competent to stand trial and reinstated criminal proceedings.

In May of 2017, a jury found appellant guilty of counts 2 and 3, and the lesser offense of second degree murder in count 1. On June 27, 2017, the trial court sentenced appellant to 25 years to life in prison on count 2 and a consecutive six-year sentence on count 3. The trial court stayed the term of count 1, pursuant to section 654.

Appellant contends on appeal that the trial court erred when it : (1) unreasonably rejected expert opinion on his incompetency; (2) refused to give a consciousness of guilt instruction as to a witness; (3) allowed introduction of an uncharged act of elder abuse; (4) allowed introduction of appellant's un-*Mirandized*[2] statement to a social worker; and (5) allowed the prosecutor to mischaracterize evidence. Appellant also contends (6) cumulative error and (7) lack of sufficient evidence to support his conviction for felony child endangerment. In supplemental briefing, appellant alleges (8) he is eligible for pretrial diversion pursuant to section 1001.36. We affirm.

## STATEMENT OF FACTS

On April 25, 2015, at approximately 9:30 p.m., two officers were dispatched to an apartment in Bakersfield where J.J. (mother) was trying to revive her four-month-old son, S., with CPR. S., who was not breathing and had no pulse, had a two-inch long oval-shaped bruise on his forehead above his left eye. When the officer asked what had happened, mother said she tried to take S. out of his swing to change his diaper and

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2.

accidently struck his head against the base of the swing, causing S. to have a seizure and stop breathing. The officer did not believe mother's story, knowing the injuries could not have happened as the result of an accidental bump on a baby swing. Fifteen minutes later, appellant arrived at the apartment.

At the time, mother and appellant lived together with their two-year-old daughter, Z., and infant S. in a two-bedroom apartment they shared with appellant's brother and his family. S. slept in a baby swing in the one bedroom, along with Z. on a mattress on the floor and mother and appellant shared a bed. Mother described appellant as happy about S.'s birth, but when he began to cry a lot at age two to three months, appellant became frustrated. When mother would pick S. up to comfort him, appellant would tell her to put him down and let him cry as "He's a boy," and "You're not supposed to hold him."

Testifying about the events before calling 911, mother stated that on the evening of April 24, 2015, she was home with the two children while appellant was out. S. had been running a slight fever and finally went to sleep. When appellant returned home at about 10:00 p.m., everyone was asleep and appellant went to bed. Around midnight, S. woke up and started screaming in pain. Mother got up, grabbed S. and tried to give him a pacifier and bottle. She rocked him and tried to distract him, but nothing worked. He eventually fell asleep and mother put him back in his swing. But 10 minutes later, S. woke again and began crying. Appellant told mother to "[s]hut him up" and make him be quiet.

Appellant then got up, shut the bedroom door and grabbed S. and started shaking him and telling him to "shut up." Mother yelled at appellant to stop, saying he was going to hurt S. and "kill him." But appellant did not stop, even though S. was no longer crying. Appellant dropped S. on the ground, and when mother went to pick him up, appellant pushed her away. He then kicked S., "[l]ike he was kicking a football", against the wall.

3.

S.'s head hit the wall above the electrical outlet, and he fell onto the mattress where Z. was sleeping, which woke her. When mother picked S. up, his nose was bleeding uncontrollably and his head was not straight. Mother did not call 911, but as time passed, she told appellant they should take S. to the hospital. Appellant refused, saying he did not want people asking what had happened to S. He specifically instructed her not to tell the police what had happened.

Mother tried to take care of S., but he could not suck on a bottle and he breathed with difficulty. His fists were clenched and would not open. Although she knew she should take S. to the hospital, she did not because she was "scared."

The following morning, mother again told appellant they should take S. to the hospital, but he said that was "not going to happen." Appellant left with his brother later in the afternoon. He did not return. That night, S. stopped breathing and mother called 911. Law enforcement and paramedics arrived, administered CPR and transported S. to the hospital. Mother followed. Before departing, Mother told detectives she was picking up S. from a small baby swing and accidentally hit his head on one of the swing's arms.

At the hospital, Mother's grandmother advised mother to tell the truth, which she subsequently did by telling detectives what actually happened. Mother said she initially lied to officers about the incident because she was fearful that Child Protective Services (CPS) would remove Z. from her. Mother and appellant had both had prior incidents with CPS, and mother would be required to take parenting and substance abuse classes in order to keep her children.

Mother was charged with felony child abuse, but later entered into an agreement in which she pled no contest to the charge and received one year in jail and five years felony probation. As part of the agreement, she was required to testify against appellant at trial. On cross-examination, mother acknowledged that she, individually, had been investigated by CPS in December 2014.

As part of her testimony, mother testified that she and appellant had a difficult relationship and that he was often jealous if anyone would speak to her, he was physically abusive towards her, and he had also been physically abusive with Z., slapping and punching her on her arms, face, back and legs and telling her to "shut up." Mother did not report this behavior because she was scared of appellant. Mother had known appellant since she was 14 or 15; at the time of the fatal incident involving S., she was 19 years old. At times, mother would leave appellant but return when he promised to change. She reported him to the police in 2013 for abusing her and again in March of 2014. She estimated that, between early 2012 and April of 2015, appellant physically abused her on 20 or 30 separate occasions and hit Z. 10 to 20 different times.

Mother testified to an incident that occurred in August 2013 when she and Z. were staying with mother's grandmother. Appellant broke into grandmother's house, when he was drunk, in an effort to see mother and Z. During the incident, grandmother slipped on the front doorstep and fell. After mother helped grandmother up, appellant kicked the door as grandmother was trying to go back into the house, trapping her arm in the door frame as he did so. Mother and Z. hid from appellant in the bathroom, but appellant broke down the door, "nudged" mother's head and left. An officer who responded to the 911 call on the incident found grandmother's right wrist severely swollen and the metal security door indented, as if it had been kicked. The locking mechanism to the bathroom door had been ripped off. Appellant was subsequently convicted of elder abuse.

Grandmother testified that she had witnessed appellant act aggressive and controlling over mother. On one occasion, he came to her house and destroyed the front door to get mother's attention. Appellant called mother "very ugly" names and threatened both mother and grandmother.

The officer who responded to mother's 911 call in March of 2014, spoke to mother, who said appellant shoved her, slapped her, and pulled her hair as she was trying

to leave the apartment. The next day, appellant admitted to another officer that he had pushed mother once or twice during the argument.

Appellant's mother testified that she had called 911 in 2013 when she witnessed appellant hitting mother in the face and body after the two had an argument. The officer who responded to the scene viewed visible redness and swelling on mother's face.

Appellant's brother, who lived in the same apartment as mother and appellant, saw appellant push mother while the two were arguing, and had seen appellant "blow up" at mother on prior occasions.

An autopsy determined S. died from blunt force head and neck trauma. He had several fractures of the skull, suffered multiple hemorrhages underneath the scalp, and several retinal and optic nerve sheath hemorrhages confirmed he had been shaken. The forensic pathologist opined that the injuries could not have been suffered accidentally, and likened them to the type suffered by persons in traffic collisions. The injuries were fresh and acute and of the same age.

Appellant spoke to officers in the early morning of April 26, 2015, a recorded interview of which was played for the jury. After he was read his *Miranda* rights, appellant claimed "It wasn't on purpose," but that he and mother were arguing and he grabbed S., tripped over a chair, and they both fell to the ground "hard." He later agreed that he did not accidentally trip with S., but that he threw S. down in anger. He admitted shaking S. "a little." When asked if anyone overheard him say anything while this was taking place, appellant said he probably said "shut up or something," but then again said "[i]t wasn't on purpose though." Appellant also admitted that he "kind of hit [S.] a little bit" and gave him "one little kick" "a little bit hard" with his foot, causing S. to fly over Z. on her mattress and hit the wall.

Appellant acknowledged having hit S. "a little" three or four times on his head a few days earlier because he was crying. He admitted hitting Z. before, but "not like that," only that he would "whoop her" when she did not listen.

6.

Appellant admitted pushing mother "a little bit" when he took S. from her. He admitted threatening to shoot her, but he explained he had told her that a long time ago and he was not serious.

After appellant kicked S., S. started bleeding from his nose, which scared both appellant and mother. Neither did anything about it, other than to clean up the blood with towels appellant later threw away.

Appellant told the interviewing detective that he was on SSI for "being … kinda slow and I can't read …, that's about all I know." When asked if he could have made a different choice that night and not beaten S., appellant said, "[c]ould of" and "I know I should of." Appellant admitted that throwing and kicking S. were bad choices and that he should have "[j]ust walked off."

Appellant acknowledged that mother had wanted to call 911 right away after everything happened, but he asked her "[W]hat are we gonna tell 'em?" Mother said she did not know. No call was made to 911. Appellant agreed that his worry of getting into trouble was stronger than him wanting to help his son. Appellant denied mother had done anything to cause the injury.

The following day, a social worker interviewed appellant at the jail after Z. had been placed into protective custody. The recorded interview was played for the jury. Appellant again admitted shaking, dropping and kicking S. Appellant thought he might have been drunk when he got mad at S.

*Defense*

Appellant blamed the incident on mother, citing her stories to the paramedics and officers who responded to the scene. Mother acknowledged she had told grandmother, on the way to the police station, that she was the one who struck S.'s head on the swing right before she called 911.

7.

Appellant's father testified that he, like appellant, had learning disabilities and were both clients at the Regional Center. Appellant's father testified that appellant had trouble with basic daily tasks, such as maintaining his personal hygiene.

In November 2016, a clinical psychologist, Nicanor S. Garcia, evaluated appellant for intellectual disabilities. Appellant appeared to be his stated age of 22 years, but was somewhat "slow and subdued" in his presentation and had a flat affect. While appellant was able to count from two to 20, he skipped a few numbers. He had difficulty spelling words like "cat" and "world" backwards. Appellant was able to remember two of the three memory words the psychologist had earlier told him. He could read some words, but was unable to explain simple proverbs.

Appellant knew who the current president was, but had slow auditory processing. He had an IQ of 59, which was in the .3 percentile and 41 points below average. Appellant had IQ tested in the same range at age 10 and was diagnosed with mild mental retardation. Dr. Garcia diagnosed appellant with "[i]ntellectual disability" "[m]ild in degree or severity." The psychologist believed appellant had limited ability to communicate, reason, problem solve, and plan. He also had limited ability to take care of himself and conceptualize everyday events. On cross-examination, the psychologist agreed that "mild" was the least severe form of intellectual disability—"moderate," "severe", and "profound" were all more pronounced diagnoses.

## DISCUSSION

I. COMPETENCE TO STAND TRIAL

Prior to trial, a hearing was held to determine appellant's competency to stand trial. Following various evaluations and testimony, the trial court found appellant competent to stand trial, a finding appellant now contests. We find no error.

*A. Background*

*Dr. Musacco's September 22 and October 16, 2015, Evaluations*

Clinical psychologist Dr. Michael Musacco was appointed by the court to make a section 1368 evaluation of appellant. During the hearing on the issue of appellant's competence to stand trial, the prosecutor presented the testimony of Dr. Musacco who interviewed appellant on September 22 and October 16, 2015.

During the first interview, appellant was uncooperative and gave many answers like "I don't know," "I can't remember," or "I forgot." Appellant claimed not to know how to add three plus four, and could not recall how many siblings he had.

Dr. Musacco observed that persons charged with serious crimes were more commonly prone to malinger their mental health symptoms. Dr. Musacco believed appellant was intellectually disabled and that, combined with the apparent malingering, made it difficult to obtain specific information from him. Appellant also acted "very emotionally distraught" during the interview. He was aware his case was very serious and he described feelings of depression and distress as a result of the charges. Appellant claimed to have heard voices after he was incarcerated.

In the Georgia Competency Test given by Dr. Musacco, appellant was asked open-ended questions such as "What does a judge do?"; "What does a jury do?"; and "What is your attorney's name?" Of the 21 questions, appellant answered all but two with "I don't know." Dr. Musacco found the answers reflected a lack of cooperation.

Dr. Musacco also gave appellant a multiple-choice competency test (CAST-MR) specifically designed for developmentally disabled persons. The test presented appellant with three potential answers for each question—appellant got only two of the 40 questions correct, well below a score based on chance alone. This score reinforced Dr. Musacco's belief that appellant was intentionally not cooperating.

On a TONI-4 nonverbal IQ test, appellant received a score of 61 after giving only one correct response. On the Rey 15-Item Memory Test, appellant was able to reproduce six of 15 symbols. Appellant did very poorly on a reading portion of an academic test.

Dr. Musacco diagnosed appellant with malingering, possessing an intellectual disability, and having an adjustment disorder caused by the stress of losing a child and being charged with the loss. Dr. Musacco later learned of an earlier telephone call between mother and appellant in jail, prior to appellant being evaluated, in which appellant said he wanted to go to Patton State Hospital instead of prison for life. This further supported Dr. Musacco's view that appellant had malingered during the first interview.

After Dr. Musacco informed appellant's counsel that he did not have a valid assessment of appellant's competency based on appellant's lack of cooperation, another evaluation was held three weeks later. This time appellant was more cooperative.

During the second interview on October 16, 2015, appellant continued to display intellectual impairment and emotional distress, but he was more responsive to testing questions and his test scores "jumped up remarkably." During the mental status portion of the exam, appellant admitted he was paranoid that he might be hurt by other inmates as a result of the charges against him.

When again given the Georgia Competency Test, appellant provided answers. To the question of "What does a judge do?" appellant replied, "It give you time or tells you how much time you have." When asked "What's your attorney's job?", he said "To help me … [h]elp me get a deal." When asked "What's the district attorney's job?" He answered, "To go against me. He's trying to give me life." When asked "What does a witness do?" He responded, "They testify against me." This time his score was 76 percent compared to the earlier 4 percent correct. Appellant knew the name of his attorney, the charges against him, the potential sentences associated with a conviction,

10.

and the basic roles of courtroom personnel. Appellant confirmed that he was able to discuss the issues in his case with his attorney.

On the other tests given, appellant's IQ was found to be somewhere in the mid 70's and he obtained a passing score of 9 on the Rey 15-Item Memory Test. Dr. Musacco offered the same diagnoses, with the exception that he no longer believed appellant was malingering. Dr. Musacco believed appellant understood the nature and purposes of the criminal proceedings against him; he was able to discuss the roles of courtroom personnel and the purpose of the court proceedings; and he was able to identify his charges and potential penalties faced. While Dr. Musacco did not expect appellant to have an astute or in-depth understanding of any of the topics, based on his intellectual disability, he believed appellant possessed enough understanding to assimilate information and, with assistance from his attorney, was competent to stand trial. Dr. Musacco also believed appellant would be able to assist his attorney in a rational manner in presenting his defense "with the important asterisk that he is mentally disabled no matter what happens." Dr. Musacco did not believe there was any treatment that could improve appellant's diagnosis of mild intellectual disability as far as enabling him to better assist his attorney or understand abstract concepts.

*Dr. Middleton's October 26, 2015, Evaluation*

At the trial court's request, psychologist Thomas Middleton evaluated appellant on October 26, 2015. Dr. Middleton found appellant "quiet, passive, laughed inappropriately, would just stare blankly at times and appeared confused." Dr. Middleton performed many of the same tests Dr. Musacco performed and found appellant oriented for person, place, and time, but his affect was flat and he was slow to respond.

Appellant admitted using alcohol and marijuana, but laughed when asked if he had used other drugs. Appellant attended high school, but could not read or write. He had never been able to obtain a driver's license. Appellant was able to acknowledge the charges he faced.

11.

Appellant did not remember the three words Dr. Middleton asked him to recall after a 20-minute delay. He could perform basic addition and subtraction, but not multiplication. He could spell three-letter words, but not four. Appellant did not have any sensory or motor deficits, but claimed a history of hallucinations and paranoid ideation.

On the Rey 15-Item Memory Test, appellant was able to recall 12 of the 15 items, but then had difficulty recalling these same items in a subsequent test. On the CAST-MR competency assessment, appellant scored 80 percent on the "basic legal concepts"; 73 percent on the "skills-to-assist-the-defense" portion; and 95 percent on the "understanding case events" portion. His overall score was 81 percent and within the competency range.

Despite these results, Dr. Middleton believed appellant was incompetent to stand trial based on "his overall presentation and his significant deficits, in terms of rationality .…" According to Dr. Middleton, appellant was not able to provide an answer when asked what would happen when he went to court. While he understood the difference between guilt and innocence, he could not explain how guilt was proven in court. Appellant did not understand the attorney/client relationship, and thought the attorney would turn him in to the judge if he admitted to the crime. He could not explain what a plea bargain was, and was not aware of sentencing options. According to Dr. Middleton, appellant appeared overwhelmed by the courtroom environment. But Dr. Middleton did acknowledge that appellant met the criteria for a basic factual understanding of the nature and purpose of a courtroom, the charges, and how to participate with counsel.

On cross-examination, Dr. Middleton agreed that a diagnosis of mild mental disability or mental retardation did not automatically equate to being incompetent to stand trial. He also acknowledged that appellant was able to understand courtroom procedures, such as a plea bargain, after they were explained to him.

12.

*Dr. Longwith's February 4, 2016, Evaluation*

Clinical psychologist Gary Longwith was hired by the defense to evaluate appellant. When Dr. Longwith evaluated appellant on February 4, 2016, he appeared somewhat disheveled, lethargic, tired, and dispirited. Appellant told Dr. Longwith he was 6'8" and weighed 150 pounds; Dr. Longwith estimated appellant to be 5'8" and about 175 pounds. While appellant made good eye contact, he was void of any affect except to laugh inappropriately. Appellant had a limited vocabulary, he would lose his train of thought, and he had difficulty remembering words he was asked to remember for 20 minutes. He was unable to do simple math or understand simple proverbs. After more testing, Dr. Longwith determined that appellant had some developmental delays relating to his memory, attention, and concentration. He was aware that appellant had been born prematurely and suspected he was borderline mentally retarded.

Appellant was able to provide Dr. Longwith with the names of his parents and eight siblings and that he started mental health treatment at the Regional Center and was medicated beginning at age 18, but did not know what type of medication. He quit taking the medication because his mother did not take him for follow-up visits. Dr. Longwith was aware that appellant had made some prior suicide attempts.

Appellant scored 58 on the Wechsler Abbreviated Scale of Intelligence test, a score that was consistent with someone who had developmental disability and mental retardation. Dr. Longwith administered the ECST-R exam to evaluate appellant's understanding of courtroom proceedings and ability to cooperate with counsel. Appellant was able to identify his attorney by first name and, when asked what he would do if he had a disagreement with counsel, he said he would discuss it with counsel, but that if counsel did not agree with him, appellant would need to do what the attorney said. Appellant did not know the difference between a bench trial and jury trial, and was under the impression that the judge would determine if he was guilty or not. Appellant thought the judge wanted to find him guilty and that the district attorney worked for the judge.

Appellant also said that it was the responsibility of the judge and the district attorney to prove he was guilty.

Appellant also thought the judge was responsible for ensuring that appellant received the most punishment possible. Appellant knew he was charged with murder, but could not recall the other charges, although he knew there were other charges. He was not able to articulate what a defense for murder would be. Appellant thought he faced a sentence of "life", which meant he would "die in jail." He understood that the purpose of the jury was to "prove that you did it." He did not know what a plea bargain was.

Dr. Longwith diagnosed appellant with mild mental retardation and schizoaffective disorder, with depressive-type psychotic features, and cannabis and alcohol abuse. Dr. Longwith opined that appellant was not competent to stand trial based on his lack of understanding of the proceedings and inability to cooperate with counsel. Dr. Longwith believed appellant had a factual understanding of the legal concept of trial proceedings that would be considered normal and passable, but he did not believe appellant rationally understood his own ability to influence and participate in the trial process.

On cross-examination, Dr. Longwith acknowledged that he had given appellant the ECST-R test, even though this was the most complex test and appellant was mildly mentally retarded. Dr. Longwith also acknowledged that appellant's score of 6 on the M-FAST test indicated a potential concern for malingering. The prosecutor asked Dr. Longwith about appellant's September 1, 2015, telephone call from jail to his mother, in which appellant said "I'm going to try to go to Patton … I ain't trying to stay here for the rest of my life." Dr. Longwith agreed, as evidenced by that telephone call, that appellant was able to discuss both his family law situation and some parts of his criminal case. And he acknowledged that the telephone call evidenced appellant's understanding that he did something wrong and could be in prison for life.

Dr. Longwith also agreed that appellant knew his attorney was trying to help him and had described his attorney's job to help him get "less[] time" and prove appellant "didn't do it." Dr. Longwith acknowledged that when he asked appellant what his attorney needed from him, appellant replied, "to tell him the truth .…" Furthermore, Dr. Longwith agreed that appellant had not had any disagreements with his attorney; he knew the judge was in charge of the court and issued the sentence; and he understood the district attorney's job was to prove appellant guilty. Dr. Longwith concluded that appellant was not competent to stand trial.

### *Testimony of Dr. Barreras*

The defense called Dr. Benjamin Barreras, a psychiatrist for the Kern County Department of Mental Health, who examined appellant in jail on October 21, 2015. Appellant reported being depressed and hearing voices, but denied having suicidal thoughts. Appellant told Dr. Barreras that a voice he heard earlier that day told him someone wanted to kill him. Appellant had a blank stare, disheveled hair, spoke in a low volume, and had a flat affect.

Dr. Barreras noted that appellant was receiving Zyprexa at the time. He diagnosed appellant with major depressive disorder with psychotic features and cannabis dependence. Dr. Barreras increased appellant's Zyprexa dosage and prescribed Prozac to treat appellant's depression. On cross-examination, Dr. Barreras acknowledged that he was not evaluating appellant for competency when he met with him.

### *Testimony of Appellant's Father and Mother*

Appellant's father testified in appellant's defense that he did not have any contact with appellant until he was two years old. Appellant was born prematurely and was in the NICU for two months. Appellant had difficulty talking and communicating, and he could not read or write. According to father, appellant sucked his thumb until he was 20 years old. Appellant's mother thought appellant was capable of working if he set his mind to it.

15.

*The Trial Court's Determination*

Following argument by counsel, the trial court found appellant competent to stand trial. The trial court explained its reasoning for its decision at length, as follows:

> "[A]s is often the case, the ultimate issue whether the defendant is competent or incompetent comes down to an evaluation of the opinions of the three experts and their testimony articulating and explaining their opinions and the bases and reasons therefore.

> "For a number of reasons, I put the least weight on the testimony of [defense expert] Dr. Longwith. Dr. Longwith's explanation of his testing and analysis and the reasons he arrived at his opinion was confusing, rambling, imprecise, and difficult to follow. He relied in great part of the ECST-R test which he acknowledged was not designed for persons with intellectual disabilities. He further acknowledged that of all the comparable tests utilized by the other experts, this was the most complex or difficult test for a subject to take, particularly when this test is utilized on a person with undisputed intellectual disabilities. The Court does not find any conclusions drawn from the results to be as reliable as the conclusions drawn by the other two experts….

> "I also note that Dr. Longwith was the only expert retained on behalf of an interested party. Although I don't think this was a substantial factor in Dr. Longwith's opinion, I do feel that the opinions of the court appointed experts are less biased and, therefore, more reliable.

> "The explanations given by [court expert] Dr. Middleton and [prosecution expert] Dr. Musacco regarding what investigations and steps they undertook, what factors they relied upon, and how and why they relied upon certain factors were much more clearly articulated, and their approaches were logically and reasonably utilized.

> "As recognized by Dr. Musacco, the similarities between the gathering of information and the analytical use of such information by both doctors, particularly emphasizing Dr. Musacco's second evaluation, were much greater than any dissimilarities. The major dissimilarity was the ultimate conclusions reached by each expert.

> "I'm giving little weight for any purpose to Dr. Musacco's first evaluation, which I believe it was September 22, 2015. I do believe that the defendant malingered and/or failed to cooperate during major portions of the first evaluation…. [¶] The defendant did provide Dr. Musacco with

16.

reliable information upon which to base an opinion in the second evaluation ….

"There's no question that defendant has intellectual disabilities which have handicapped him his entire life. [¶] I accept that defendant is illiterate. There's no question that these disabilities alone make it more difficult for defendant to cooperate with his attorney and make it more difficult for his attorney to defend defendant when compared to a hypothetical defendant without such disabilities. [¶] Both Dr. Middleton and Dr. Musacco were in agreement that such disabilities alone or the range of defendant's reported IQ scores alone did not support a finding of noncompetence. [¶] Illiteracy is not unheard of in persons of average and above-average intelligence. In this case it is merely one corroborating factor to both expert's opinions that defendant has an intellectual disability.

"Both Doctors Middleton and Musacco agreed with basic diagnoses that in addition to intellectual disabilities, defendant suffered from depression, anxiety, emotional distress, mood disorder, although expressed in slightly different terms by each.

"The People argue that defendant's expression of a desire to go to Patton State Hospital rather than face a lengthy prison sentence supports conclusions, among others, that defendant is malingering and is attempting to manipulate the results of this competency hearing. [¶] The Court only partially agrees with the People's position. I do not conclude from such statement that the defendant is malingering or attempting to manipulate the result of the hearing. I do, however, find that these statements demonstrate that defendant has a realistic understanding of the potential penalties he is facing and a general understanding about additional or alternative outcomes. This does tend to support, at least in part, a finding of competency.

"I think we all agree that the legal standards of competency bear no relationship to mental states or lack thereof required to prove the elements of the crimes that are charged in this case. [¶] Under applicable law, the defendant is presumed to be competent, and the defendant has the burden of proving by a preponderance of the evidence that he is not competent. [¶] The legal standard as set forth in CALCRIM 3451 under this instruction as a matter of law, defendant is mentally competent to stand trial if he can do all of the following three elements: One, understand the nature and purpose of the criminal proceedings against him; two, assist in a rational manner his attorney in presenting his defense; and three, understand his own status and condition in the criminal proceedings.

17.

"The bar imposed by the standard … requires only a general understanding. It does not require that a defendant have a full understanding of the legal intricacies related to the required understandings. It does not require that defendant be able to answer detailed follow-up questions about such legal concepts. This is the standard utilized by Dr. Musacco in forming his opinion that defendant is competent. [¶] … [¶]

"Dr. Musacco found that the defendant, despite his handicaps and deficits, could and does understand the nature and purpose of the criminal proceedings, could and does understand his own status and condition in the criminal proceedings, and could assist in a rational manner his attorney in presenting his defense, albeit with more difficulty than a person without defendant's intellectual disability."

The court continued:

"I believe that th[e] use of terms and explanations provided by Dr. Middleton is consistent with the intent and holdings of the *Dusky*[3] and *Lightsey*[4] cases … as I understand those holdings, that to satisfy the second element of CALCRIM 3451, defendant's understanding of the first and third elements of understanding must be sufficient to allow him to utilize this understanding in assisting his attorney in a rational manner.

"[I]f this is the case, Dr. Middleton followed the correct legal standard, but his explanation was anything but clear. And I do believe that Dr. Middleton followed the correct legal standard. [¶] Dr. Middleton concluded that defendant is unable to assist his attorney in a rational manner, which is the most fundamental contrast between his testimony and opinion and that of Dr. Musacco. [¶] But as Dr. Middleton applied the *Dusky* and *Lightsey* cases, it's also possible that he may have concluded that defendant's factual understanding was not even sufficient to meet the first and third elements of the CALCRIM instructions. But that's not the way that I understood his testimony.

"But in either event, Dr. Middleton's opinion may either be seen to be in contradiction to that of Dr. Musacco with respect to all three elements of the CALCRIM instruction or, given his finding of factual understandings, he may be seen to be in agreement with the first and third element but different only on the second element, and that's the view of the Court, the latter.

---

[3]     *Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*).

[4]     *People v. Lightsey* (2012) 54 Cal.4th 668 (*Lightsey*).

"The defense in this case did a good job in explaining through testimony and argument that both defendant and defense counsel are handicapped in this case by defendant's intellectual disabilities, but I do not believe this fact negates any of the elements set forth in CALCRIM 3451.

"For these reasons, I conclude that Dr. Musacco's opinion is the better reasoned and better supported opinion, and that once defendant had a factual understanding of the nature and purpose of the criminal proceedings and of his own status and condition in the proceedings, he was and is able to assist in a rational manner his attorney in presenting his defense.

"As argued by the People, the legal standard of competency does not require defendant to be able to challenge witnesses, withstand cross-examination effectively, or understand the legal intricacies of the laws allegedly violated or defenses to those accusations. Those matters are primarily the job of the defense attorney. The only obligation of defendant is that he be able to assist his counsel in presenting his defense in a rational manner.

"And despite my understanding that defendant and his attorney have a more difficult task compared to a case in which defendant did not have such intellectual disabilities, I find that defendant is legally competent pursuant to application of the legal standards described above.

"It may be that defense counsel will have to explain things differently or repeat his advice as the doctors occasionally had to do in their testing and evaluation; however, I find that defendant's intellectual disabilities do not, per se, render him unable to obtain the requisite understanding or unable to rationally assist his counsel. [¶] So my finding is that defendant is competent."

*B. Applicable Law and Analysis*

"The United States Supreme Court has 'repeatedly and consistently recognized that "the criminal trial of an incompetent defendant violates due process." ' [Citation.] A defendant is deemed incompetent to stand trial if he lacks ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... [or] a rational as well as factual understanding of the proceedings against him.' " ' [Citations.]" (*Lightsey, supra,* 54 Cal.4th at p. 690.)

"The applicable state statutes essentially parallel the state and federal constitutional directives. Section 1367, subdivision (a) provides: 'A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*Lightsey, supra,* 54 Cal.4th at p. 691, quoting former § 1367, subd. (a)[5]; accord *People v. Jablonski* (2006) 37 Cal.4th 774, 807–808.) The determination is " 'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' " (*Dusky, supra,* 362 U.S. at p. 402; *People v. Ramos* (2004) 34 Cal.4th 494, 507; § 1367, subd. (a).)

A defendant is presumed competent and when the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence. (§ 1369, subd. (f); *People v. Ary* (2011) 51 Cal.4th 510, 518; *People v. Dunkle* (2005) 36 Cal.4th 861, 885, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *Medina v. California* (1992) 505 U.S. 437, 446 [this burden of proof does not offend federal constitutional principles].)

We apply a deferential substantial evidence standard of review on appeal. "In reviewing a … determination that a defendant is competent to proceed to trial, we give due deference to the trier of fact, and therefore view the record in the light most favorable to the verdict." (*People v. Frye* (1998) 18 Cal.4th 894, 1004, disapproved on other

---

[5]     The first sentence of section 1367, subdivision (a), now reads: "A person shall not be tried or adjudged to punishment or have their probation, mandatory supervision, postrelease community supervision, or parole revoked while that person is mentally incompetent." The second sentence is not changed.

grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 31*; People v. Samuel* (1981) 29 Cal.3d 489, 505.) When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial. (*People v. Marks* (2003) 31 Cal.4th 197, 218, fn. 3 (*Marks*).) As we shall explain, we believe that the verdict of competence was supported by substantial evidence.

Appellant argues substantial evidence fails to support the trial court's finding of competence to stand trial because the trial court rejected the majority opinion on competency and unreasonably rejected Dr. Longwith's evaluation. Appellant contends, despite the trial court's statements to the contrary, the tests given by Dr. Longwith were appropriate; there was no evidence Dr. Longwith was biased, even though retained by the defense; and Dr. Longwith's testimony was clear and straightforward.

We disagree. While appellant couches his argument in terms of lack of substantial evidence, appellant's real complaint is that he disagrees with the trial court's rejection of Dr. Longwith and Dr. Middleton's opinions. However, the appropriate test on appeal is whether the trial court's ruling is supported by substantial evidence. (*Marks, supra,* 31 Cal.4th at p. 214.) The test is not whether an expert's opinion was erroneously disregarded, as the weight to be given expert opinion rests exclusively with the trier of fact. (See *People v. Wolff* (1964) 61 Cal.2d 795, 804; § 1127(b).) Evidence is not rendered insufficient by the rejection of the opinion of one or more experts. (*People v. Bean* (1988) 46 Cal.3d 919, 933, fn. 4.)

Appellant is arguing that Dr. Musacco's evaluation was insufficient evidence of competence because it conflicted with Dr. Longwith and Dr. Middleton's evaluations. But again, the test on appeal is not whether substantial evidence of mental incompetence was presented or whether the trial court should have valued one expert opinion over another. Our task is to review all the evidence in the light most favorable to the court's finding of competence to determine whether substantial evidence supports that finding.

21.

(*People v. Marks, supra,* 31 Cal.4th at p. 214.)  The opinion of a single witness, even expert witness, may provide substantial evidence to support a finding by the trier of fact. (*People v. Vega* (2005) 130 Cal.App.4th 183, 190, disapproved on other grounds in *People v. Ruiz* (2018) 4 Cal.5th 1100, 1122, fn. 8.)

Substantial evidence supports the trial court's ruling.  The trial court meticulously considered the evaluations of all three experts and it was Dr. Musacco's evaluation that the trial court found persuasive.  While all three experts diagnosed appellant with mild mental retardation, Dr. Musacco, whose expertise was not challenged, opined that appellant was not suffering from a mental illness that deprived him of the ability to consult rationally with counsel or to understand the proceedings.  Appellant passed a competency test given to him by both Dr. Middleton and Dr. Musacco.  In fact, appellant had an overall score of 80 on the CAST-MR competency test administered by Dr. Middleton, well above the cutoff score of 70 percent for individuals to be considered competent to stand trial.

The trial court observed that Dr. Musacco and Dr. Middleton both gave appellant similar tests and reached similar conclusions, both agreeing that appellant's intellectual disabilities alone did not support a finding that he was not competent.  The trial court credited Dr. Musacco's opinion that appellant understood the nature and purpose of the criminal proceedings, his own status in the proceedings, and that he could assist his attorney in a rational manner in presenting his defense.  The trial court also thought appellant's own statement to his mother that he wanted to go to Patton indicative of competence, at least in part, as he understood the potential penalties and outcomes of his case.

The trial court understood Dr. Middleton's testimony as arriving at the same conclusion as Dr. Musacco, with the exception that Dr. Middleton did not believe appellant could assist his attorney in a rational manner.  While the trial court acknowledged that both appellant and his attorney would be handicapped by appellant's

intellectual limitations, it did not believe this circumstance resulted in a finding of incompetency. The trial court noted that the legal standard of competency did not require appellant to supply his own defense or understand intricacies of the law, but instead required him to be able to assist counsel in presenting his defense in a rational manner. The trial court opined, based on the testimony of the psychologists, that appellant was able to do so.

Dr. Musacco found appellant understood the charges and the proceedings against him, demonstrated an understanding of basic courtroom proceedings, and had the capacity to cooperate rationally with an attorney. Dr. Musacco concluded that appellant was competent to stand trial. In that appellant failed to overcome the presumption that he was competent to stand trial, we find no error in the trial court's conclusion. (See § 1369, subd. (f); *Marks, supra,* 31 Cal.4th at p. 214.)

## II. INSTRUCTION ON MOTHER'S CONSCIOUSNESS OF GUILT

Appellant contends the trial court violated his due process rights in refusing his request to modify CALCRIM No. 362 and include mother in the consciousness of guilt instruction. We find no error.

### A. Background

At the jury instruction conference, defense counsel asked the trial court to modify CALCRIM No. 362 to include mother based on false and misleading statements she had given. After reviewing the use notes to CALCRIM No. 362, the trial court refused the request, noting that the instruction was uniquely applicable to the defendant and did not apply to other witnesses. CALCRIM No. 362 was subsequently given as follows:

> "If the defendant made a false or misleading statement before this trial relating to the charged crimes, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crimes and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

23.

*B. Applicable Law and Analysis*

Appellant's request for modification was essentially a request for a pinpoint instruction on third-party culpability, highlighting his defense theory that it was mother, not appellant, who caused the injuries to S.

" '[I]n appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case .... [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]." (*People v. Bolden* (2002) 29 Cal.4th 515, 558; see *People v. Williams* (2016) 1 Cal.5th 1166, 1193.) "[A]ssertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838; see *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

As respondent notes, the California Supreme Court in *People v. Hartsch* (2010) 49 Cal.4th 472, in addressing a similar instruction (CALJIC No. 2.03), held it is not error for a trial court to refuse to give a pinpoint instruction on third party culpability, stating neither logic nor authority supported such an instruction and such "instructions add little to the standard instruction on reasonable doubt." (*Hartsch, supra,* at pp. 501, 504.) The *Hartsch* court further "held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Id.* at p. 504.) As the Supreme Court explained, "It is hardly a difficult concept for the jury to grasp that acquittal is required if there is a reasonable doubt as to whether someone else committed the charged crimes." (*Ibid.*) *Hartsch* was neither the first nor last time the Supreme Court reaffirmed this principle on third party culpability. (See, e.g., *People v. Earp* (1999) 20 Cal.4th 826, 887; *People v. Ledesma*

24.

(2006) 39 Cal.4th 641, 720; *People v. Gutierrez* (2009) 45 Cal.4th 789, 824–825; *People v. Covarrubias* (2016) 1 Cal.5th 838, 907–908.)

At trial, mother admitted lying about what had happened to S., and the jury learned that she had pled no contest to felony child abuse in connection with his death. The trial court instructed with CALCRIM No. 226, which listed multiple factors to apply in assessing mother's testimony, including "Did the witness make a statement in the past that is consistent with or inconsistent with … her testimony?"; "Did the witness admit to being untruthful?"; and "Was the witness promised immunity or leniency in exchange for … her testimony?"

The trial court also properly instructed the jury with CALCRIM No. 220 that a defendant was presumed innocent, the prosecution bore the burden of establishing his guilt beyond a reasonable doubt, and the jury must acquit appellant if the prosecution did not meet its burden. Appellant's proposed "instruction[ ] add[ed] little" to this pattern instruction. (*People v. Hartsch, supra,* 49 Cal.4th at p. 504.) Thus, the trial court did not err in refusing to give it.

Even assuming the trial court erred in failing to instruct on mother's consciousness of guilt or third party culpability, the error was harmless. In addition to the instruction on reasonable doubt and the prosecution's burden of proof, the jury knew from defense counsel's argument that the defendant's theory was that mother, not appellant, committed the injuries on S. resulting in his death. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed pinpoint instruction, it would have come to any different conclusion in this case. (*People v. Earp, supra,* 20 Cal.4th at p. 887.)

## III.    ADMISSION OF APPELLANT'S RECENT ACTS OF ELDER ABUSE

Appellant next contends evidence of his prior acts of elder abuse was erroneously introduced as propensity evidence because his case involved child abuse. We find no prejudicial error.

25.

*A. Background*

Prior to trial, appellant moved to exclude reference of any of his prior bad acts or convictions under Evidence Code section 1101, subdivision (a). The People moved to admit evidence of prior domestic violence and child abuse under Evidence Code sections 1101, subdivision (b) and 1109, explaining that appellant had previously been physically abusive towards both mother and the children, citing incidents in July and August of 2013 and March of 2014. The July 2013 and March 2014 incidents involved appellant hitting and shoving mother. The August 2013 incident involved appellant coming to mother's grandmother's house where mother was staying, demanding entrance, kicking the door and then smashing it into grandmother's wrist before grabbing mother and pushing her to the ground.

At the hearing on the motion, defense counsel objected to the admission of the acts of elder abuse stemming from the August 2013 incident, claiming it was more prejudicial than probative pursuant to Evidence Code section 352. Defense counsel requested that, if that incident was admitted, it include no "discussion" of any assault or injury to grandmother. The trial court disagreed, finding that if appellant's efforts to get and assault mother also involved abuse of grandmother, it was an "intentional act. And in that respect, is relative to that point."

The prosecutor explained that she did not intend to call grandmother as a witness, but planned to call the officer who responded to the scene, as well as mother, who took photographs of grandmother's wrist. The prosecutor explained that, after appellant slammed grandmother's arm with the door, he entered the house and became violent towards mother, who was hiding in the bathroom. The prosecutor characterized it as "all part of one continuous course of conduct …."

The trial court, after weighing the Evidence Code section 352 factors, determined that the probative value of admitting the three mentioned incidents outweighed any prejudicial effect. The trial court found that the incidents were not remote in time, they

were relevant to the issue of premeditation, malice aforethought, and intent. The trial court also observed that the prior incidents were of increasing seriousness and demonstrated appellant's quickness to anger.

   *B. Applicable Law and Analysis*

Evidence Code section 1109 embodies a number of exceptions the Legislature has enacted to Evidence Code section 1101, which prohibits evidence of a person's character or character trait when offered to prove his or her conduct on a particular occasion. (See Evid. Code, § 1101, subd. (a).) Such evidence, commonly referred to as "character" or "propensity" evidence (*People v. Disa* (2016) 1 Cal.App.5th 654, 670), is generally barred by subdivision (a) of Evidence Code section 1101. However, "the Legislature has … created specific exceptions to the rule against admitting character evidence in cases involving … domestic violence, elder or dependent abuse, or child abuse ([Evid. Code,] § 1109, subd. (a)(1)–(3).)" (*People v. Disa, supra,* at p. 670.) Such evidence is admissible only "if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1109, subd. (a)(1), (2), & (3).) The jury is allowed to draw such propensity inferences by a preponderance of the evidence. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1030.)

" 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419, citing the legislative history of the statute; see also *People v. Brown* (2011) 192 Cal.App.4th 1222, 1225 [finding murder to be the "ultimate form of domestic violence" under the facts presented.)

Appellant contends Evidence Code section 1109, subdivision (a)(2), which allows prior elder abuse as propensity evidence, is only admissible if the current offense also

involves elder abuse, not child abuse, as alleged here. Thus, he contends, the evidence of elder abuse involving grandmother was erroneously admitted and requires reversal.

Respondent argues the statutory language of Evidence Code section 1109 does not bar evidence of elder abuse in a child abuse case. Instead, the only qualification is that both the prior and current conduct must be acts of domestic violence as defined by section 13700 or Family Code section 6211, if the act occurred no more than five years before the charged offense. (See Evid. Code, § 1109, subd. (d)(3).)

For instance, in *People v. Dallas* (2008) 165 Cal.App.4th 940, 947–948 (*Dallas*), prior acts of child abuse and of domestic violence against a former girlfriend were admissible in a child abuse prosecution under Evidence Code section 1109. In *Dallas*, the defendant was charged with felony infliction of injury to a child (§ 273d, subd. (a)) and felony child abuse (§ 273a, subd. (a)) based on injuries sustained by his current girlfriend's baby, who lived in the same home as the defendant. (*Dallas, supra,* 165 Cal.App.4th at pp. 942–943.)

Among other things, the defendant in *Dallas* argued on appeal that the trial court erred in admitting the prior acts of domestic violence against the former girlfriend because "he was charged only with child abuse, not domestic violence, and therefore evidence of acts of domestic violence was not admissible under Evidence Code section 1109." (*Dallas, supra,* 165 Cal.App.4th at p. 952.) After conducting a detailed statutory analysis, the court in *Dallas* rejected the defendant's argument, concluding that "because defendant lived with the baby, this was ... a prosecution for 'domestic violence' so that prior acts of domestic violence were ... admissible under Evidence Code section 1109, subdivision (a)(1)." (*Dallas, supra,* at pp. 942–943.)

The statutory analysis in *Dallas* focused on the definition of "domestic violence" as set forth in Evidence Code section 1109. As the court explained, "Evidence Code section 1109 provides: ' "Domestic violence" has the meaning set forth in Section 13700. Subject to a hearing conducted pursuant to Section 352, which shall include consideration

28.

of any corroboration and remoteness in time, "domestic violence" has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense.' (Evid. Code, §1109, subd. (d)(3).)" (*Dallas, supra,* 165 Cal.App.4th at p. 952.) Turning to Family Code section 6211, the court noted that domestic violence was defined as "including abuse committed against either '[a] cohabitant or former cohabitant, as defined in Section 6209,' (Fam. Code, § 6211, subd. (b) ) or '[a] child of a party' (Fam. Code, § 6211, subd. (e))." (*Dallas, supra,* at p. 953.) Further, the court explained that "Family Code section 6211 expressly incorporates the following definition in Family Code section 6209: ' "Cohabitant" means a person who regularly resides in the household.' " (*Dallas, supra,* at p. 953) Therefore, because "[t]he baby regularly resided in defendant's household," the defendant "was charged with an offense involving 'domestic violence' within the meaning of Family Code section 6211." (*Dallas, supra,* at p. 953.) Based on its statutory analysis, the court concluded that "the trial court did not err by admitting the evidence of prior acts of domestic violence." (*Id.* at p. 957.)

As respondent notes here, Family Code section 6211, broadly defines "domestic violence" as abuse perpetrated against a current or former spouse; current or former cohabitant; a person with whom the perpetrator is having or has had a child; a child of party or a child who is subject of an action under the Uniform Parentage Act; or any other person related by consanguinity or affinity within the second degree. (Fam. Code, § 6211, subds. (a)–(f).) Respondent argues that it is this last category to which grandmother belongs, qualifying her as a target of domestic violence under the definition.

Even assuming appellant's act against grandmother was an act of domestic violence, " ' "[t]he principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' " (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.) Although "dissimilarity alone does not compel exclusion" of otherwise admissible propensity evidence (*People v. Cordova* (2015) 62 Cal.4th 104, 133), incidents " 'may be

dissimilar enough, or so remote or unconnected to each other, that the trial court could apply the criteria of [Evidence Code] section 352 and determine that it is not proper for the jury to consider one or more of the ... [other] offenses as evidence that the defendant likely committed' " the offense in question. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1163.) As to probative value, " '[t]he court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered ....' " (*People v. Harris* (1998) 60 Cal.App.4th 727, 739–740.) Put differently, the uncharged prior offense evidence " 'must have some tendency in reason to show that the defendant is predisposed to engage in conduct *of the type charged*.' [Citation.]" (*People v. Jandres* (2014) 226 Cal.App.4th 340, 355, original italics.)

Here, the trial court could reasonably have determined that appellant's August 22, 2013, elder abuse of grandmother was relevant to show appellant's propensity to commit acts of domestic violence. The attack on grandmother was connected to his attack on mother on the same date, which occurred less than two years before S.'s death and was therefore relevant to show propensity under Evidence Code section 1109.

However, even relevant evidence of past domestic violence may be excluded when its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) " 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] ' "The prejudice which ... Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' [Citations.]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) Here, the prior

elder abuse incident was certainly not more inflammatory than the current charges; there was no risk of confusion between the former and current charges; and the evidence was not unduly time consuming. (Evid. Code, § 352.)

Furthermore, the jury was appropriately instructed on reasonable doubt; the necessity of proof for the elements of the offenses, the limited purpose for which the evidence of prior abuse was admitted, and the requirement that the prior abuse had to be proven by a preponderance of the evidence. (CALCRIM Nos. 220, 852, 853.) As to the prior acts of elder abuse, the trial court specifically instructed, both at the time the officer testified to the event and during jury instructions:

> "The People also presented evidence that the defendant committed abuse of an elder that was not charged in this case .… Abuse of an elder means physical abuse or other treatment that results in physical harm or pain or mental suffering.… [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged abuse of an elder. [¶] …If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] Now, if you decide that the defendant committed the uncharged abuse of an elder, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit abuse of an elder, and based on that decision, also conclude that the defendant was likely to commit and did commit any of the crimes charged here. [¶] If you conclude that the defendant committed the uncharged abuse of an elder, that conclusion is only one factor to consider along with all the other evidence. [¶] It is not sufficient by itself to prove that the defendant is guilty of any of the crimes charged here. The People must still prove each charge beyond a reasonable doubt. Do not consider this evidence for any other purpose."

We assume the jury followed these instructions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25–26; *People v. Panah* (2005) 35 Cal.4th 395, 492.)

In any event, even if we were to agree that appellant's acts toward grandmother did not constitute domestic violence within the meaning of Evidence Code section 1109 and was inadmissible, we would not reverse. Error in admitting evidence of a defendant's prior acts of domestic violence under Evidence Code section 1109 is subject

31.

to the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 [any error in admitting uncharged act of domestic violence was harmless under *Watson*].) Under the *Watson* test, the trial court's judgment may be overturned on appeal only if appellant shows "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra,* at p. 836.) Such is certainly not the case here, where the evidence against appellant was substantial, including appellant's admissions that he hit, shook, and kicked S. Because we find any error harmless, we need not address appellant's further argument of ineffective assistance of counsel.

## IV.     *MIRANDA* WARNING WHEN QUESTIONED BY SOCIAL WORKER

Appellant next contends the statements he gave to a social worker while he was in jail and admitted at trial violated his Fifth Amendment right against self-incrimination as he was not advised of his *Miranda* rights prior to speaking to the social worker. We find no prejudicial error.

### A. Background

Prior to trial, the prosecutor filed a motion to admit appellant's statement to the Child Protective Services (CPS) social worker, made when appellant was in jail the day after he was arrested. The interview was recorded. Appellant filed an opposition, arguing that the social worker was required to give him *Miranda* warnings before interviewing him and therefore violated his Fifth Amendment rights. In a supplemental motion, appellant argued that, by cooperating with the social worker and asserting his right to family reunification services, appellant could not be deemed to have waived his Fifth Amendment right against self-incrimination and the statements would not be used in his criminal case.

At the hearing on the motion, the social worker for minor Z. testified that his role as a social worker was to investigate child abuse and neglect. The social worker interviewed appellant on April 27, 2015, behind a glass partition at the jail, and his focus

32.

of the interview was to determine if appellant's daughter Z. had been physically abused and/or neglected so a proper placement for her could be made. Prior to the interview, the social worker contacted a detective familiar with the case because he was aware that a criminal investigation was ongoing and he did not wish to interfere with or disrupt the investigation. The detective gave the social worker a brief synopsis of the injuries appellant inflicted on S., including appellant's confession, which resulted in Z. being placed into protective custody. The social worker requested a police report of appellant's criminal case. The detective did not ask the social worker to do anything related to the police investigation, and the social worker was not acting at the detective's direction when he interviewed appellant.

In the interview, which was played at the hearing, the social worker contacted appellant via telephone, told appellant who he was and that he was with child protective services with regard to Z. After asking appellant various questions about whether appellant was Z.'s father and if he was on the birth certificate, the social worker explained he was there "with regard" to appellant's children "who are at risk of abuse or neglect." When asked if appellant had any other children besides Z., appellant replied "S[.]", and the social worker then told appellant that he had spoken to officers, had gotten "some information," and wondered if appellant wanted to tell the social worker what happened. Appellant replied, stating he "really didn't mean to." When the social worker asked "What?", appellant said S. was crying, he picked him up out of the swing and shook him. The social worker asked how many times appellant shook S., and appellant replied, "three or four" and then said he dropped S. on the bed. When asked if appellant ever kicked S., appellant replied "I didn't kick him hard." When asked if appellant kicked S. across the bed, appellant said he thought S. "hit his head on the wall."

In response to questions, appellant told the social worker that mother was present when this happened and asked him to stop, but he could not explain why he did not. Appellant described S. as "bleeding out his nose."

33.

The social worker then asked appellant if he had ever punched S. with his fist or open hand. Appellant replied, "[t]his was a long time ago," and then said he hit S. two to three months earlier "one time" when he was crying.

Appellant also said that, during the current incident, both he and mother cleaned up S., but he "just laid there." Neither he nor mother took S. to the hospital because both were "so scared," and appellant did not know what to do. Appellant said mother called for an ambulance when he was not home.

The social worker asked appellant various other questions, about who lived in the apartment with him and mother, whether he used drugs, whether he used alcohol; about his parents and siblings, and if he was employed.

The social worker then explained there was going to be a hearing "separate from" the hearing he was in jail for, and it had to do with Z. He asked if there was someone able to take care of her. Appellant replied his father and provided a telephone number. When asked if he had any questions, appellant replied "I don't." The social worker thanked appellant and then said it was best that appellant worked on his anger issues and it was best to try and get counseling. The social worker then said he would see appellant at the hearing and "we'll kinda go from there."

At the hearing, the social worker testified that, although he had read in previous CPS referrals that appellant might have some developmental delays, he felt that appellant understood the questions asked.

On cross-examination, the social worker explained he had 48 hours to investigate Z.'s case before the deadline to file a dependency petition in family court. He received the referral for Z.'s case from the police department. When he wrote his social study detention report regarding Z., the social worker summarized what appellant had said about how S. was injured.

Following the social worker's testimony, the prosecutor maintained the social worker was not acting at the direction of any law enforcement official when he

34.

interviewed appellant at the jail. The prosecutor also maintained that the social worker never made any implied or express promises to appellant. The trial court agreed on this point, noting that the social worker tried to emphasize to appellant the separation between appellant's dependency case involving Z. and his criminal case.

Defense counsel argued that CPS had the discretion whether to file a petition to remove a child from a parent's custody, and that the social worker in this case was acting as an agent of the State and should have given appellant a *Miranda* advisement. He also argued that the social worker's advice to appellant to get anger management counseling further complicated his role.

The trial court denied the motion, finding that the social worker was acting "solely in his capacity as a social worker, and I don't detect any evidence that the gentleman was acting under any arrangement." The trial court continued, stating "as a social worker discussing placement proceedings that he held at the juvenile court and that he was acting as part of his regular employment duties" did not require the giving of *Miranda* warnings "because he is not, and was not at the time, an agent of the police." In doing so, the trial court specifically mentioned *People v. Battaglia* (1984) 156 Cal.App.3d 1058, 1064, which references social workers as not being agents of the police and therefore not required to advise a defendant of *Miranda* rights. The trial court also noted that a social worker is a mandated reporter under section 11166, and in this instance the focus of the social worker's interview was to ascertain the welfare and safety of minor children.

At a subsequent hearing, defense counsel argued that under Welfare and Institutions Code section 319, there was government action at play when the social worker interviewed appellant because it was a statutorily required investigation. The trial court again denied the motion to exclude appellant's statement to the social worker, stating that "under the totality of the circumstances … [the social worker] was not acting as [an] agent of the state or as law enforcement. He was performing his duties as a social worker."

35.

The social worker subsequently testified at trial and the audio recording of the interview was played for the jury.

## B. Standard of Review

"When reviewing a ruling admitting a confession, we accept the trial court's resolution of any factual dispute to the extent the record supports it, but otherwise we determine independently whether the confession was taken in violation of the rules of *Miranda*..., or was involuntary." (*People v. Sanchez* (2019) 7 Cal.5th 14, 48; accord *People v. Case* (2018) 5 Cal.5th 1, 20 [In reviewing a trial court's determination of whether admission of a defendant's statements violated *Miranda*, " '[w]e independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' "]; *People v. Gamache* (2010) 48 Cal.4th 347, 385 [same].) "To the extent mixed questions of fact and law are present, they are reviewed de novo if predominantly legal and for substantial evidence if predominantly factual." (*Gamache, supra,* at p. 385.) Because the facts are not in dispute, we independently review whether the social worker was required to provide a *Miranda* warning prior to interviewing appellant.

## C. Applicable Law and Analysis

"The Fifth Amendment provides that '[n]o person ... shall be compelled in any criminal case to be a witness against himself.' [Citations.] To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation [citation], the high court adopted a set of prophylactic measures requiring law enforcement officers to advise an accused of his right to remain silent and to have counsel present prior to any custodial interrogation [citation].... [¶] A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 338–339; accord, *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 217 " '*Miranda* makes clear that in order for defendant's statements to be admissible against

him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel.' "].)

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374; accord, *People v. Jackson, supra,* 1 Cal.5th at p. 339.) "California courts have limited [*Miranda's*] requirements ... to 'law enforcement officials,' their agents, and agents of the court, while the suspect is in official custody." (*In re Deborah C.* (1981) 30 Cal.3d 125, 130 [private store detective was not required to give *Miranda* warning before questioning juvenile after citizen's arrest for shoplifting]; accord, *People v. Thornton* (2007) 41 Cal.4th 391, 432 ["Interrogation thus refers to questioning initiated by the police or its functional equivalent ...."]; see *Estelle v. Smith* (1981) 451 U.S. 454, 467 (*Estelle*) [psychiatrist performing court-ordered pretrial psychiatric examination of defendant in custody was required to provide *Miranda* warning as an "agent of the State"].)

Appellant relies on *Estelle, supra,* 451 U.S. at page 468, and *Mathis v. United States* (1968) 391 U.S. 1, 88 (*Mathis*) to support his argument a social worker acts as an agent of law enforcement when questioning a suspect in custody. Both are distinguishable. In *Estelle*, in holding *Miranda* applied to questioning by a doctor in a court-ordered psychiatric examination, the United States Supreme Court explained, "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because [defendant] did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said [in the evaluation] to establish his future dangerousness." (*Estelle, supra,* 451 U.S. at p. 468; accord, *People v. Pokovich* (2006) 39 Cal.4th 1240, 1253 [Fifth Amendment privilege against self-incrimination barred use at trial of

statements made by defendant in compelled mental competency examination].)  Unlike the defendants in *Estelle* and *Pokovich*, who were required to submit to a court-ordered psychiatric examination, appellant was not required to submit to an interview with the social worker or answer his questions.  While we recognize appellant had an interest in cooperating with the social worker to protect his parental interest in custody of Z., as discussed below, he could have testified fully at any dependency hearing pursuant to Welfare and Institutions Code section 355.1, subdivision (f), without risking use of his statements in the criminal case.

In *Mathis, supra,* 391 U.S. at page 4, the United States Supreme Court held an Internal Revenue Service agent was required to provide a *Miranda* warning before interviewing a suspect who was in custody for a separate offense because "tax investigations frequently lead to criminal prosecutions ...."  The court rejected the People's argument the agent elicited the incriminating statements during a " 'routine tax investigation.' "  (*Ibid.*)  In contrast to a dependency investigation designed to determine the best interests of a child, an Internal Revenue Service investigator is required under the tax code to refer a case for investigation by an agent who works on criminal matters as soon as the investigator finds " 'definite indications of fraud or criminal potential.' "  (*Id.* at p. 6, fn. 2 (dis. opn. of White, J.).)

In the very recent case of *People v. Keo* (2019) 40 Cal.App.5th 169, (*Keo*), decided after briefing in this case was complete, the court addressed the issue of whether a social worker is acting as a law enforcement or as an agent of law enforcement, and therefore required to provide a *Miranda* warning before interviewing a defendant in a criminal case.  In doing so, the *Keo* court did a lengthy analysis and emphasized that the social worker's function was to determine the best interests of the child and whether to return a child to a parent's custody after release.  "Unlike criminal trials, the primary purpose of dependency hearings is to protect the child, not prosecute the parents."  (*In re Corey A.* (1991) 227 Cal.App.3d 339, 346; accord *In re James F.* (2008) 42 Cal.4th 901,

38.

915 ["[T]he ultimate consideration in a dependency proceeding is the welfare of the child ...."]; see Welf. & Inst. Code, § 202, subd. (a) ["The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public."].)

As our Supreme Court has explained, "In a criminal prosecution, the contested issues normally involve historical facts (what precisely occurred, and where and when), whereas in a dependency proceeding the issues normally involve evaluations of the parents' present willingness and ability to provide appropriate care for the child and the existence and suitability of alternative placements." (*In re James F., supra,* 42 Cal.4th at p. 915.) Further, the responsibility to perform the dependency evaluation falls on the social worker. (Welf. & Inst. Code, § 281 [social worker "shall upon order of any court in any matter involving the custody, status, or welfare of a minor or minors, make an investigation of appropriate facts and circumstances and prepare and file with the court written reports and written recommendations in reference to such matters"]; *In re M.B.* (2011) 201 Cal.App.4th 1057, 1071 [Welf. & Inst. Code, § 281 directs social worker to investigate facts and circumstances and file report with court, which report is admissible (including hearsay) in any dependency proceeding].)

In *Keo, supra,* 40 Cal.App.5th 169, the defendant was convicted, inter alia, of the second degree murder of his girlfriend, who was the mother of his two sons. On appeal, the defendant claimed error by the trial court in admitting statements he made, without *Miranda* warning, while in custody to a social worker performing an investigation in a dependency proceeding filed with respect to defendant's two sons. The defendant urged the court of appeal to find his due process rights were violated because he was forced to choose between protecting his parental rights in the dependency proceedings and his right not to incriminate himself in the criminal case. (*Keo, supra,* at p. 174.)

The court in *Keo* found that the social worker was not acting as law enforcement or as an agent of law enforcement, and therefore was not required to provide a *Miranda* warning before interviewing the defendant. In doing so, the court noted the social worker had not discussed the facts of the case with the police or prosecutor prior to interviewing the defendant, except to ask the prosecutor what charges had been brought against the defendant and the status of the criminal case. The social worker had not informed the police or the prosecutor that she intended to interview the defendant. While the social services department later advised the prosecutor that the defendant had made statements to the social worker, the prosecutor did not obtain a copy of the defendant's statements until a year after the interview, in response to the prosecutor's subpoena requesting the social worker's report. (*Keo, supra,* 40 Cal.App.5th at p. 184.)

Here, the purpose of the social worker's discussion with appellant was similar to that of the social worker and defendant in *Keo*, although the social worker here had discussed the case, albeit briefly, with the detective prior to interviewing appellant and had been told of appellant's confession. The social worker had not been advised what to ask appellant.

Even assuming, arguendo, that a *Miranda* violation occurred, we turn to the question of prejudice. The erroneous admission in violation of *Miranda* is reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18, 24, under which we inquire whether the error may be deemed harmless beyond a reasonable doubt. (*People v. Cunningham* (2001) 25 Cal.4th 926, 994.) Under this standard, the evidence that remains after appellant's statements made to the social worker are excluded must not only be sufficient to support the verdict, but must overwhelmingly establish his guilt beyond a reasonable doubt. (*People v. Villasenor* (2015) 242 Cal.App.4th 42, 69.) The evidence in this case satisfies this high standard.

The jury heard appellant's properly admitted statements to police that he had thrown S. down in anger, shook him, hit him, and kicked him so that he flew over to his

40.

sister on a mattress on the floor, hitting his head on the wall. Appellant admitted to the officers that neither he nor mother called an ambulance, even though it was apparent S. had been badly injured. Appellant's statements to the social worker were cumulative of this evidence, and the statements to the officers even more detailed than what he had told the social worker. Any error in admitting the statements to the social worker were harmless beyond a reasonable doubt.

## V.  PROSECUTOR'S COMMENTS DURING CLOSING

Appellant next contends the prosecutor committed prejudicial error during rebuttal. We find no error.

### A.  Background

Appellant's defense was that mother committed the injuries that led to S.'s death. During closing argument, defense counsel asserted that the prosecutor's timeline did not match up to the facts. As argued by defense counsel, the pathologist had testified that S.'s injuries were "fresh", "[t]hey all occurred at the same time," and all of the injuries were "unsurvivable," but, according to mother's version of the event, S. survived 18 and a half hours.

In rebuttal, the prosecutor questioned appellant's version of the events placing the blame on mother, noting that, when the paramedic arrived, S. already had a bruise on his head, which "does not form within seconds and minutes." Instead, the prosecutor argued that the pathologist testified the injuries "were fresh, meaning recent, acute, which is 24 hour injuries."

Defense counsel objected, stating there was "[n]o evidence of that." The trial court subsequently instructed the jurors that, if they had questions about what a particular witness testified to, they could request a full or partial read back of the testimony.

### B.  Applicable Law and Analysis

"A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in

41.

exercising the sovereign power, of the state." (*People v. Hill* (1998) 17 Cal.4th 800, 820.)   The standards governing review of [prosecutorial] misconduct claims are settled. " ' "A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' " (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1266, citing, in part, *Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.)   Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.)   "In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." (*Ibid.*)   "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)   To establish a claim of misconduct, "bad faith" on the prosecutor's part is not required. (*People v. Hill, supra,* 17 Cal.4th at pp. 822–823.)   " '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' [Citation.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667.)

Appellant now contends the prosecutor's argument mischaracterized the record and introduced facts outside the record, and that the trial court erred in failing to correct the prosecutor's errors. " 'Although it is misconduct to misstate facts, the prosecutor "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom." ' [Citation.]" (*People v. Powell* (2018) 6 Cal.5th 136, 183.)

Here, at trial, the pathologist was not specific about when S.'s injuries occurred, but testified "[a]ll the injuries are of the same age and they're all fresh and acute." Defense counsel attempted to get a more exact timing from the pathologist and asked how long he would expect death to occur after the infliction of injuries. The pathologist replied, "[h]owever long it took for the infant to die."

From this testimony, one could reasonably infer that it might take S. a while to actually die and death would not have been immediate. The prosecutor's description of S.'s injuries as "fresh" and "acute" would reasonably cover injuries occurring within 24 hours of his death. There was therefore no misconduct on the part of the prosecutor, and the trial court did not err in failing to correct the prosecutor.

## VI. CUMULATIVE ERROR

Appellant contends that the cumulative effect of all of the above errors deprived him of a fair trial. We have either rejected appellant's claims of error and/or found any errors, presumed or not, were not prejudicial. Viewed cumulatively, we find any errors do not warrant reversal of the judgment. (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## VII. SUFFICIENT EVIDENCE TO SUPPORT FELONY CHILD ENDANGERMENT

Appellant contends that the act of kicking S. towards Z. was insufficient evidence to support his conviction for felony child endangerment of Z., pursuant to section 273a, subdivision (a). We disagree.

### A. Standard of Review

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is

reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) It is the jury, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. (*Ibid.*) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid.*)

We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis ... is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*)

### B. Applicable Law and Analysis

Section 273a, subdivision (a) is " ' "intended to protect a child from an abusive situation in which the probability of serious injury is great." ' [Citation.]" (*People v. Valdez* (2002) 27 Cal.4th 778, 784 (*Valdez*).) It provides in relevant part: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, ... having the care or custody of any child, ... willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (§ 273a, subd. (a).) A violation of section 273a, subdivision (a) " ' "can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." [Citation.]' " (*Valdez, supra*, at p. 784.) There is no requirement that the actual result be great bodily injury. (*Ibid.*)

"[C]riminal negligence is the appropriate standard" in cases involving indirect infliction of harm. (*Valdez, supra,* 27 Cal.4th at p. 781; see CALCRIM No. 821.) "Criminal negligence is ' "aggravated, culpable, gross, or reckless ... conduct ... [that is] such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life …." ' [Citation.]" (*Valdez, supra*, at p. 783; see also *People v. Sargent* (1999) 19 Cal.4th 1206, 1215.) " 'Under the criminal negligence standard, knowledge of the risk is determined by an objective test: "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness." ' [Citations.]" (*Valdez, supra*, at p. 783.)

Appellant argues the felony child endangerment conviction must be reversed because there was insufficient evidence from which the jury could find beyond a reasonable doubt that he kicked S. toward Z.placing her at risk, but instead kicked him "upward and above" Z., toward the wall, avoiding any possible injury to Z. Mother testified that appellant kicked S. "just lifting up his body" and "dropkick[ed]" him like a "football" "three or four feet" into the air toward the wall where Z. was sleeping. When S.'s body hit the wall, he dropped onto the mattress next to Z., waking Z. Appellant acknowledged to officers that he kicked S. "up" and "over" Z., onto the wall.

The jury was instructed with CALCRIM No. 821, in relevant part, that to find appellant guilty of felony child endangerment, they had to find:

> "[T]he defendant willfully caused or permitted a child to suffer unjustifiable physical pain or mental suffering or the defendant, while having custody and control of a child, willfully caused or permitted the child to be placed in a situation where the child's person … or health was endangered and two, the defendant caused or permitted the child to suffer or be … [en]dangered under circumstances or conditions likely to produce great bodily harm or death and, third, the defendant was criminally negligent when he caused or permitted the child to suffer or be endangered.…"

The instruction further defined an act done willfully, as well as the requirements for criminal negligence.

Despite appellant's claim to the contrary, on this record and viewing the evidence in the light most favorable to the jury's verdict, we conclude sufficient evidence supports appellant's felony child endangerment conviction. That is, substantial evidence established the circumstances of appellant forcefully kicking S. off the ground in the direction of Z. as she lay sleeping could naturally and probably result in harm to Z. Appellant's conduct was " ' "such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life." ' " (*Valdez, supra,* 27 Cal.4th at p. 783.)

## VIII.  PRETRIAL DIVERSION

Effective June 27, 2018, the Legislature enacted sections 1001.35 and 1001.36 to the Penal Code, authorizing trial courts to grant "pretrial diversion" to defendants diagnosed with qualifying mental disorders. On September 30, 2018, section 1001.36 was amended to eliminate diversion eligibility for certain serious felony offenses, including murder. (§ 1001.36, subd. (b)(2)(A); Stats. 2018, ch. 1005, § 1.) This amendment took effect on January 1, 2019.

In supplemental briefing, appellant argues that section 1001.36, which allows pretrial mental health diversion, is ameliorative and, therefore, applies retroactively to his case and requires remand for a diversion hearing. He also argues that the 2019 amendment eliminating his eligibility due to his murder conviction is, essentially, not ameliorative, therefore prospective only and not applicable to his case. Finally, he argues that the 2019 amendment eliminating eligibility for murder convictions cannot apply to him retroactively due to ex post facto considerations. The People respond that section 1001.36 operates prospectively only and that, in any event, appellant is ineligible under section 1001.36 for pretrial diversion because he was charged and convicted of murder.

In June 2020, our Supreme Court in *People v. Frahs* (2020) 9 Cal.5th 618, settled the issue of retroactivity of the pretrial mental health diversion program, concluding that section 1001.36 applies retroactively to judgments that are not final and that conditional remand is appropriate to conduct a mental health diversion eligibility hearing. (*Frahs, supra,* at pp. 635, 640.) However, the court declined to address the separate retroactive issue of the 2019 amendment, which made appellant categorically ineligible.

The answer to the ex post facto challenge to the 2019 amendment is well established. "A statute violates the prohibition against ex post facto laws if it punishes as a crime an act that was innocent when done or increases the punishment for a crime after it is committed." (*People v. White* (2017) 2 Cal.5th 349, 360.) The ex post facto rule is to ensure fair notice of the conduct that constitutes a crime and the punishment that can imposed for the crime. (*In re Vicks* (2013) 56 Cal.4th 274, 287.) The "operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is *criminal conduct* committed before the disputed law took effect." (*People v. Trujeque* (2015) 61 Cal.4th 227, 256, italics added.)

When appellant murdered S. in 2015, he was sentenced under the law as it existed in 2015. The mental health diversion program became operative in 2018, and for seven months he *may* have been eligible. Now he is not eligible because of his murder exclusion. The 2019 enactment of the murder exclusion "did not change the consequences of his crime *as of the time he committed it.*" (*People v. McShane* (2019) 36 Cal.App.5th 245, 260; See *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1054.)

## DISPOSITION

The judgment is affirmed.

                                                            FRANSON, J.

WE CONCUR:


DETJEN, Acting P.J.


DESANTOS, J.